IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

ANDREW SCHRADER, et al.,          )
                                  )
      Plaintiffs,                )
                                  )
v.                                )     NO. 3:20-cv-00500
                                  )
STORAGE FIVE CLARKSVILLE, LLC,    )     JUDGE RICHARDSON
et al.,                           )
                                  )
      Defendants.                )

## MEMORANDUM OPINION AND ORDER

This action for personal injury presents claims of negligence and loss of consortium under Tennessee law (*see* Doc. No. 43, Amended Complaint), invoking this Court's diversity jurisdiction. 28 U.S.C. § 1332(a)(3). Currently pending are Motions for Summary Judgment filed separately by each of the four Defendants named in the Amended Complaint: New Century Doors and Building Components, Inc., d/b/a New Century Doors, Inc. ("New Century") (Doc. No. 86); Denver Commercial Builders, d/b/a Reconn Construction Services ("Reconn") (Doc. No. 90); Storage Five Clarksville, LLC ("Storage Five") (Doc. No. 93); and Janus International Group, LLC ("Janus") (Doc. No. 98).

This Memorandum Opinion concerns New Century's Motion for Summary Judgment and associated filings (Doc. Nos. 86–86-3, 118), and the responsive filings of Plaintiffs Andrew and Lavina Schrader. (Doc. Nos. 102–04, 123.) As explained below, New Century's Motion for Summary Judgment is **DENIED**.

## BACKGROUND

New Century attaches to its Motion two documents, in addition to its Memorandum of Law: its Statement of Undisputed Material Facts required by Local Rule 56.01 (Doc. No. 86-2) and the full transcript of Plaintiff Andrew Schrader's discovery deposition. (Doc. No. 86-3.) In response to these filings, Plaintiffs have filed their Responses to New Century's Statement of Undisputed Material Facts (Doc. No. 104) and a Memorandum of Law (Doc. No. 103), to which they attach excerpts from various depositions, New Century's Answers to Interrogatories, and the Subcontract Agreement between New Century and Janus. (Doc. Nos. 103-1–103-7.)[1] These filings from the parties to this summary judgment motion comprise "the summary judgment record." The following description of the underlying facts is given in two parts; first, the undisputed facts that are the skeletal frame of New Century's Motion, and second, a lengthy excerpt from Plaintiff's deposition (attached to New Century's Motion) that fleshes out the incident that spawned this litigation.

### Undisputed Facts as Stated Pursuant to Local Rule 56.01

This matter arises from an alleged trip-and-fall incident that occurred on June 20, 2019, when Plaintiff Andrew Schrader ("Plaintiff")[2] was employed by Active Energy Services, LLC ("Active Energy") on a job site. (Doc. No. 104, Plaintiffs' Responses to New Century's Statement of Undisputed Facts, at 1 ¶ 1.) Plaintiff alleges that he tripped and fell on a piece of debris left on the job site while he was "walking to install a plywood board." (*Id.* at 2 ¶ 2.) New Century was a

---

[1] These filings are duplicated at Docket Numbers 109 and 110.

[2] Plaintiff Lavina Schrader asserts a claim for loss of consortium resulting from the injury to her husband, Andrew Schrader. (*See* Doc. No. 43 at 20.) The Court uses the singular "Plaintiff" in this Memorandum Opinion to refer to Andrew Schrader, although for clarity his name is used instead of "Plaintiff" in places in proximity to the term "Plaintiffs."

subcontractor on the job site installing storage units. (*Id.* ¶ 3.) On the date of the incident, Plaintiff was acting as the superintendent for his employer, Active Energy. (*Id.* ¶ 4.)

On the morning of the incident, Plaintiff was working with "Reggie" to install plywood on an interior structure. (*Id.* at 4 ¶ 10.) Plaintiff was walking toward Reggie to attempt to assist in that effort. He had nothing in his hands and there was nothing obstructing his view. (*Id.* ¶ 11.) There was a concave piece of wire mesh on the floor in the area where Plaintiff was walking. (*Id.* at 5 ¶¶ 12–13.) Plaintiff tripped on the piece of wire mesh and fell. (*Id.* ¶ 14.) When he fell, Plaintiff hit his wrist on a temporary support that cut his wrist. (*Id.* at 6 ¶ 17.) Plaintiff admits that the temporary supports were used "all over the job site." (*Id.* ¶ 18.)

### Additional Factual Background

For purposes of ruling on New Century's Motion, the Court takes as true the below description of the sequence of events as perceived by Plaintiff and reported in his sworn deposition testimony. While the parties advance different arguments and draw different conclusions from this testimony, New Century does not rebut or otherwise dispute the underlying facts reported therein.

At his deposition (Doc. No. 86-3), Plaintiff testified as to the circumstances of his work on the project, fall, and injury, as follows:

Q.     So on the day that you had the accident, you were working in that position as a superintendent?

A.     I was on a job site. Rich [Everett, Plaintiff's boss at Active Energy] was on the job site. He was working on the plumbing with some of the guys [constructing a break room and restroom area] . . . and asked me to get that wall covered [with plywood], that one end of the break area, restroom area. . . .

* * *

Q.     And you were putting plywood sheeting up on a wall?

A.     Yeah. We built a wall. We built the room inside this whole warehouse to accommodate[e] male/female restrooms and a janitor closet and a break area for the people that work there.

Q.      So this -- this area which you were constructing, would this -- was this in the middle of the building?

A.      Let's say it was in the middle, yeah, pretty close.

Q.      Okay.

A.      It was a little bit more toward the back, but it was right in the middle.

Q.      All right. So besides this, I guess, you put up metal studs to build --

A.      Metal studs, then apply joists. The very first wall as you come to it, there is storage units on this side of it. We had to put a solid wall on there so anybody renting them storage units, wouldn't bust through and walk into the break area or whatever.

                                * * *

Q.      So these would be the storage units where, if you rent one --

A.      Yeah.

Q.      -- you would open it like a garage door, and that's your area to store things?

A.      Right. That area that we were in, they had the front walls [of the storage units] up, but they didn't have the side walls done yet. And no wire on top of them either. . . . They were right there where we were, the storage units were -- well, I know the front wall was up, and they had braces holding them up. Of course, that's one of those that I fell and hit my hand on. They had no side walls, and we were putting the plywood on the back wall so they'd have a solid wall on the back of the storage unit.

Q.      Okay. So tell me what happened as far as the accident goes. What -- you know -- you know, think back in your mind, say, five or ten minutes before the accident, lead me through what you can remember or what happened afterwards.

A.      Well, we already had the plywood stacked on the saw horses. Reggie and I, we got all that together and all of our tools out. Reggie was on the ladder. I think he was having difficulty getting the plywood lined up by himself to get some screws in it and get started. So I left from the saw horses to come around. When I did, on the floor was that little remnant of that woven wire. And somehow it got tangled up in my feet as I was trying to walk around to Reggie to get to the plywood. When I did, it caused me to trip over that one track right there, and when I did, I fell forward. Trying to catch myself, I hit that metal. . . .

                                * * *

Q.     All right. How big of a -- how -- is this like -- would this be some wire that was kind of wadded up, or was it a flat piece of wire or -- or a remnant?

A.     Not totally flat. When it comes in a roll, it's got a little natural arc it wants to be into, but the -- it wasn't a very big piece, but it had enough arch to it where it wasn't laying flat on the floor either.

                    * * *

Q.     Where was this piece of wire in relation to the work site that you were working on? You talked about the horses and the plywood.

A.     Between the saw horses and Reggie. I had come around the corner. It was right there on the corner right next to that track.

Q.     Right next to what?

A.     There -- there's a -- they put a track on the ground to build these storage units. They put them on all four sides, and they stand their walls up in them. Well, they lay it out in an anchor that -- to the ground to hold the base of a wall up, or wall to the floor. All they had there was a track. Track and they had some braces coming down there. The wire was on the end closest to wall I was working on, that woven wire. Right down there on the floor. Well, I stepped over it, I thought. I was trying to get around there to Reggie. It had just enough of that arch in it, I guess, to get tangled on my foot, shoes, whatever. And when it did, it disrupted my step to where I caught that ledge. I assume I caught the ledge, but that's when I fell forward and landed on the floor.

                    * * *

Q.     And where were you trying to go?

A.     I was trying to help Reggie. I was coming around the saw horses. The horses -- the horses were just right on the corner. I was going from the horses around to help Reggie hold that piece of plywood on the wall so he can get some screws in it to fasten it. And I had to walk around he and his ladder, then step across that channel there, that track. Of course, I guess the -- the metal was there also, that woven wire. And when I did, I must have caught it because I had to little bitty arch into it, and like I say, that disrupted my step, my forward motion, and I caught my shoe on it and fell over.

Q.     Were you aware of that strip of wire mesh being on the floor before you stepped over it?

A.     No. Not that I remember. . . .

                    * * *

Q.      So as your (sic) walking around to help Reggie, and as you're moving forward, right before you fell over or tripped forward, did you see the wire mesh before the fall? Or did you only become aware of it after the fall?

A.      I don't remember seeing it before the fall. It was -- I don't know how to answer that. They say it was there. And I seem to think it was there.

Q.      Did you make an attempt to step over it?

A.      Yes, I did. I knew it was there, but did I see that one time? I wasn't looking down. I knew the track was there, and I know I was trying to get over that track. So I -- when I did, I might not have gotten my foot high enough to clear that debris.

Q.      Well, when you say you knew it was there, do you mean you had seen it before, but not at that point when you fell?

A.      I seen it before, but I wasn't working that far from the wall because I was working next to the wall previously with Reggie getting measurements. He went and got a ladder so he [could] get the screws in the top of the plywood. When he needed help for the next piece, I had to walk further out around him, and that's where the wire was, a little bit further from the wall. Previous to that, I was working up closer, and it wasn't part of the problem.

                     * * *

Q.      . . . Take us through what happened.

A.      As I was falling?

Q.      Yes.

A.      As I was falling, I knew I was falling, so I immediately tried to roll, to catch myself on my right shoulder. I mean, it just came natural. I didn't want to bury my face in the concrete right there, so I kind of rolled my shoulder, and I'm stretching out with this hand to catch myself, and as I fell, when I landed, I hit that diagonal brace coming down, and of course, my hand hit it, and that's what cut it. And then I landed on my shoulder. . . .

Q.      So that -- it was some angle bracing that cause[d] the laceration to your wrist, right?

A.      It was like an angle iron, but it was sheet metal, like 21, 24 gauge metal, and they just bend it at a 90 degrees. But they had it standing upright like this and at an angle with the -- with a blade side facing upwards, I guess you'd call it.

Q.      And so this -- this piece of angle iron it's not really -- more sheet metal, was that installed or was that sitting loose?

A.      It was installed as a temporary support to hold the front walls up during construction.

Q.      Okay. So that would not have been part of the final construction?

A.      No. It'd come down as they build the walls.

        * * *

Q.      Now, your -- the complaint refers to the fact that the razor -- or the sharp edge was facing up.

A.      Yes.

Q.      Was this how other bracing was installed, to your knowledge?

A.      They were all -- I was told they were all like that. When I fell and cut myself, I was told they were all like that. And of course, this comes from Rich Everett, because after the accident, he said they went through and changed -- turned them all around the other way.

        * * *

Q.      Was there a walkway meeting directly up to the area where you were putting the plywood up?

A.      There was a clear path where we were working, yes.

Q.      And you chose to cut through the shorter route and cut through where that track was already laid on the ground?

A.      Say that again, please.

Q.      Yes. You were cutting through one of the storage units; is that correct?

A.      Yes.

Q.      And the storage unit that you were walking through had a track already laid on the ground; is that correct?

A.      Yes.

Q.      So you were cutting through the storage unit that had the track laid already and into the area where you were going to work?

A. Yes.

(Doc. No. 86-3 at 27–28, 47, 48–50, 51–52, 53–54, 55–56, 58–59, 72–73, 120.)

Photographs of the scene of Plaintiff's accident—including the below images depicting the plywood wall, the storage unit frames and their angled support braces, and the convex remnant of wire mesh—have been filed on the record in this case. (Doc. No. 94-2.) While these photographs were not included in the briefing on New Century's summary judgment motion, Federal Rule of Civil Procedure 56(c)(3) provides that although the Court "need consider only" materials cited in the parties' briefing, "it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3); *see* Fed. R. Civ. P. 56(c) advisory committee's note to 2010 amendment ("[A] court may consider record materials not called to its attention by the parties."). These photographs are included here as a visual aide to give context to Plaintiff's above-quoted testimony and the Court's discussion herein; they are not construed as depicting the scene in the immediate aftermath of Plaintiff's injury or the accurate placement of the wire mesh in relation to the frames or the wall at the time of the accident.





## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). In other words, even if genuine, a factual dispute that is irrelevant or unnecessary under applicable law is of no value in defeating a motion for summary judgment. *See id.* at 248. On the other hand, "summary judgment will not lie if the dispute about a material fact is 'genuine[.]'" *Id.*

A fact is "material" within the meaning of Rule 56(c) "if its proof or disproof might affect the outcome of the suit under the governing substantive law." *Reeves v. Swift Transp. Co.*, 446 F.3d 637, 640 (6th Cir. 2006) (citing *Anderson*, 477 U.S. at 248), *abrogated on other grounds by Young v. Utd. Parcel Serv.*, 575 U.S. 206 (2015). A genuine dispute of material fact exists if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Harris v. Klare*, 902 F.3d 630, 634–35 (6th Cir. 2018). The party bringing the summary judgment motion has the initial burden of identifying portions of the record that demonstrate the absence of a genuine dispute over material facts. *Pittman v. Experian Info. Sols., Inc.*, 901 F.3d 619, 627–28 (6th Cir. 2018) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). Alternatively, the moving party may meet its initial burden by otherwise "show[ing]"—even without citing materials of record—that the nonmovant "cannot produce admissible evidence to support a material fact (for example, the existence of an element of a nonmovant plaintiff's claim)." Fed. R. Civ. P. 56(c)(1)(B). If the summary judgment movant meets its initial burden, then in response the non-

moving party must set forth specific facts showing that there is a genuine issue for trial. *Pittman*,

901 F.3d at 628.[3] Importantly, "[s]ummary judgment for a defendant [that has met its initial burden

as the movant] is appropriate when the plaintiff 'fails to make a showing sufficient to establish

the existence of an element essential to [her] case, and on which [she] will bear the burden of proof

at trial.'" *Cleveland v. Pol'y Mgmt. Sys. Corp.*, 526 U.S. 795, 805–06 (1999) (quoting *Celotex,* 477

U.S. at 322).

Any party asserting that a fact cannot be or genuinely is disputed (*i.e.*, any party seeking

summary judgment and any party opposing summary judgment, respectively) can support the

assertion either by: (a) citing to materials in the record, including, but not limited to, depositions,

documents, affidavits, or declarations, Fed. R. Civ. P. 56(c)(1)(A), or (b) "showing" (i) that the

adverse party cannot produce admissible evidence to raise a genuine dispute as to that fact or (ii)

that contrary to the claim of the adverse party, the materials cited by the adverse party do not

actually establish the absence or presence (as the case may be) of a genuine dispute as to that fact.

In reviewing a motion for summary judgment, this court must view the evidence in the

light most favorable to the non-moving party. *Tlapanco v. Elges*, 969 F.3d 638, 647 (6th Cir. 2020)

(quoting *Anderson*, 477 U.S. at 248). Likewise, the court should view the facts and draw all

reasonable inferences in favor of the non-moving party. *Pittman*, 901 F.3d at 628. Credibility

judgments and weighing of evidence are improper. *Hostettler v. College of Wooster*, 895 F.3d 844,

852 (6th Cir. 2018). As noted above, where there is a genuine dispute as to any material fact,

summary judgment is not appropriate. *Id*. The court determines whether sufficient evidence has

been presented to make the issue of fact a proper jury question. *Id*. The mere existence of a scintilla

of evidence in support of the non-moving party's position will be insufficient to survive summary

---

[3] Courts (appropriately) at times refer interchangeably to a party being able to raise a genuine issue as to a
fact and a reasonable jury being able to find in the party's favor on that fact, and this Court does likewise.

judgment; rather, there must be evidence upon which the jury could reasonably find for the non-moving party. *Rodgers v. Banks*, 344 F.3d 587, 595 (6th Cir. 2003).

<u>ANALYSIS</u>

Where, as here, the basis for jurisdiction is diversity of citizenship of the parties, the Court applies the substantive law of the forum state—in this case, Tennessee. *Corley v. Wal-Mart Stores East, LP*, 637 F. App'x 210, 211 (6th Cir. 2016). Under Tennessee law, to establish a claim for negligence, Plaintiffs must prove: (1) a duty of care owed by New Century to Andrew Schrader; (2) conduct falling below the applicable standard of care that amounts to a breach of that duty; (3) an injury or loss; (4) causation in fact; and (5) proximate or legal cause. *See York v. Hilton Worldwide, Inc.*, No. 2:11-CV-3033-JPM-CGC, 2013 WL 2948443, at *3 (W.D. Tenn. June 14, 2013) (quoting *Satterfield v. Breeding Insulation Co.*, 266 S.W.3d 347, 355 (Tenn. 2008)). New Century's summary judgment burden, then, is initially to identify portions of the record that demonstrate the absence of a genuine dispute over material facts concerning one or more of these elements, and then to demonstrate that in the absence of such factual issue(s), it is entitled to judgment as a matter of law.

In its supporting Memorandum, New Century asserts that "[t]here is no direct evidence that New Century, or anyone acting on their behalf, left the mesh in the area where Plaintiff tripped," and that it owed him no duty in any event to remove the piece of mesh because, as supposedly demonstrated by his deposition testimony, the mesh's presence was not a "latent or hidden" (and thus not an unreasonably dangerous) condition and could not have been reasonably foreseen by New Century as causing the injury Plaintiff ultimately sustained. (Doc. No. 86-1 at 4–7.) New Century also purports to "affirmatively negate" the elements of breach and causation-in-fact, based on (1) Plaintiff's admission "that he saw the wire mesh" and (2) New Century's deduction from

that admission that Plaintiff's "own negligence was [therefore] the cause-in-fact of his fall," inasmuch as he "could have moved" the mesh or taken "easily usable alternate routes . . . in lieu of stepping over the object." (*Id.* at 6.) As explained below, while New Century initially demonstrates an absence of any genuine factual dispute with regard to the element of duty, it is wrong on the law applicable to those undisputed facts; furthermore, Plaintiff has succeeded in demonstrating additional undisputed facts which inform the Court's determination, as a matter of law, that New Century owed Plaintiff a duty of care. And with regard to breach, causation, and comparative fault, the Court finds that the summary judgment record reveals issues of fact which must be resolved by a jury.

### Duty

In negligence cases, "the initial focus is on whether a duty exists[.]" *Green v. Roberts*, 398 S.W.3d 172, 177 (Tenn. Ct. App. 2012). "The existence of a duty is a question of law for the court[.]" *Turner v. Jordan*, 957 S.W.2d 815, 818 (Tenn. 1997). More precisely, the Court must determine whether the facts in evidence show that the parties stand in such a relationship that, if the relationship is ultimately established before the trier of fact, the defendant will owe a duty of care to the plaintiff as a matter of law. *Bradshaw v. Daniel*, 854 S.W.2d 865, 869 (Tenn. 1993) (quoting *Lindsey v. Miami Development Corp.*, 689 S.W.2d 856, 859 (Tenn. 1985)); *see Garcia v. Norfolk S. Ry. Co.*, 266 S.W.3d 917, 922 (Tenn. Ct. App. 2008) (quoting *Kelley v. Middle Tennessee Emergency Physicians, P.C.*, 133 S.W.3d 587, 598 (Tenn. 2004)). With regard to this threshold question of duty, New Century analogizes to cases involving the liability of property/premises owners and argues that it "did not owe a duty of care to Plaintiff in regard to the condition at issue, a large piece of wire mesh," because the piece of mesh was not "hidden or latent," was "neither dangerous nor defective," and therefore could not be foreseen as the cause of

Plaintiff's harm. (Doc. No. 86-1 at 6–7.) New Century further argues that, although "Plaintiff complains that the angle bracing on which he cut his wrist was installed with a sharp edge facing upward," he testified that he was responsible for his own safety on the job site and that the bracing was used "all over" the site. (*Id.* at 6 (citing Plaintiff's deposition testimony).)

In response, Plaintiff draws a distinction between the instant scenario and the premises-liability cases cited by New Century, arguing that New Century, "as another contractor working on the same job site," owed him a duty of care "to work in a reasonably safe manner that did not place him or other workers on the site in danger of injury." (Doc. No. 103 at 9.) Plaintiff argues that the extent to which the piece of scrap mesh and sharp edges of the temporary angle bracing were "open and obvious" dangers is not properly considered as the litmus test of New Century's *duty*; rather, this consideration comes into play in determining *comparative fault* after a duty of care is established. (*Id.* (citing *Coln v. City of Savannah*, 966 S.W.2d 34, 36–37 (Tenn. 1998), *overruled on other grounds by Cross v. City of Memphis*, 20 S.W.3d 642 (Tenn. 2000)).) Plaintiff cites the deposition testimony of New Century's general manager and corporate designee, Mr. Wilson Vargas, who testified that New Century (1) installed woven wire mesh atop the storage units on the project as the final step in their construction, and (2) installed temporary angle bracing throughout the site with the sharp edges exposed and facing upward even though the bracing could be installed with its sharp edges facing downward without losing any of its utility. (Doc. No. 103 at 4–5, 7 (citing Doc. No. 103-5).) Plaintiff argues that the exposed, upward-facing sharp edges of the angle bracing could alone be the foreseeable cause of a workplace injury giving rise to a duty of care, and "was only exacerbated by New Century creating a tripping hazard by leaving the wire mesh roll on the ground in the vicinity of one of the angle braces." (*Id.* at 11.)

The Court agrees with Plaintiff that the cases cited by New Century do not squarely apply here. Those cases establish the legal standards for determining the duty of a property/premises owner to an invitee or other person legally on the property. An owner's duty with regard to subcontractor-invitees like Plaintiff is "to exercise reasonable care to ensure that [the subcontractor's] work area [is] reasonably safe." *Miranda v. CSC Sugar, LLC*, No. W2017-01986-COA-R3-CV, 2018 WL 3302035, at *5 (Tenn. Ct. App. July 5, 2018). That duty encompasses a responsibility that property owners have toward all non-trespassers on their property, "to remove or warn against latent or hidden dangerous conditions on the premises of which [the owner] was aware or should have been aware." *Lunsford v. K-VA-T Food Stores, Inc.*, No. E2019-01272-COA-R3-CV, 2020 WL 1527002, at *3 (Tenn. Ct. App. Mar. 31, 2020) (quoting *Rice v. Sabir*, 979 S.W.2d 305, 309 (Tenn. 1998)).

Here, the record establishes that Plaintiff and New Century do not have an owner/invitee relationship. But even if they did, New Century's focus on whether it had a duty to warn of or remedy a dangerous condition that is "open and obvious," versus "hidden or latent," is misplaced. "Tennessee courts no longer ask whether a condition is 'open and obvious' *as a means of determining a defendant's duty*. Instead, the 'open and obvious' doctrine is now applied under comparative fault principles" by the factfinder, after the court "first determine[s] whether a duty of care is owed due to the presence of a dangerous condition." *Id.* at *4 n.4 (emphasis added) (citing *Coln*, 966 S.W.2d at 37, 43).

At least as between Plaintiff and New Century, this is not a premises liability case but a garden-variety negligence case. *Compare Seymour v. LQ Mgmt., LLC*, No. 3:16-CV-03039, 2018 WL 6341703, at *2–3 & n.2 (M.D. Tenn. Dec. 5, 2018) (describing additional considerations and elements when evaluating "a particular kind of negligence claim—one founded on a premises

liability theory"). Accordingly, a "duty of care" is defined as simply "the legal obligation owed by [a] defendant to [a] plaintiff to conform to a reasonable person standard of care for the protection against unreasonable risks of harm." *Marla H. v. Knox Cnty.*, 361 S.W.3d 518, 531 (Tenn. Ct. App. 2011) (quoting *Downs ex rel. Downs v. Bush*, 263 S.W.3d 812, 819 (Tenn. 2008)); *see Satterfield*, 266 S.W.3d at 355 (conducting oneself in a way that "involve[es] unreasonable danger to others" is "[t]he core of negligence") (quoting W. Page Keeton, *Prosser and Keaton on the Law of Torts* § 31, at 169 (5th ed. 1984)). In order to determine whether a particular risk of harm is unreasonable, presents a danger to the plaintiff, and thus gives rise to the defendant's duty to protect against it, "courts must first establish that the risk is foreseeable"; "if an injury could not have been reasonably foreseen, a duty does not arise even if causation-in-fact has been established." *Marla H.*, 361 S.W.3d at 532 (quoting *Giggers v. Memphis Hous. Auth.*, 277 S.W.3d 359, 365 (Tenn. 2009), and *Satterfield*, 266 S.W.3d at 366)).

Importantly, however, the standard for evaluating foreseeability depends on the element of negligence under consideration. *See Marla H.*, 361 S.W.3d at 532 ("[T]he role that the concept of foreseeability plays in the context of a court's determination of the existence and scope of a duty differs from the role the concept plays when the fact-finder is addressing proximate causation.") (quoting *Satterfield*, 266 S.W.3d at 376). At the duty stage, foreseeability is to be evaluated using "a more general approach to the likelihood of harm," whereas at the causation stage "the foreseeability of the specific harm suffered by the plaintiff" must be determined. *Id.* In short, "[a] duty of reasonable care typically will exist—and a risk of harm will be deemed unreasonable— where the foreseeability of the risk and the gravity of the potential harm outweigh the burden on the defendant to prevent the harm from occurring." *Id.* at 533 (citing, *e.g.*, *Lourcey v. Estate of Scarlett*, 146 S.W.3d 48, 54 (Tenn. 2004)).

In the case at bar, the Court finds that the summary judgment record, viewed in the light most favorable to Plaintiff, establishes with no genuine dispute that Plaintiff and New Century were separately contracted to perform work in close proximity on the same job site; that New Century's work on the project involved the installation of wire mesh on top of the storage units it constructed; that Plaintiff tripped and fell when he was attempting to traverse a row of storage-unit frames to perform work on a wall adjacent to those frames, at least in part due to the presence on the floor of a piece of wire mesh; that Plaintiff was injured during the fall when his wrist and hand came into contact with the exposed, extremely sharp edges of a diagonal brace installed by New Century as temporary support for the front wall of the storage-unit frames it was constructing; and that the angle bracing could have been installed with the sharp edges facing either up or down, without affecting the support provided. Employing the "more general approach to the likelihood of harm" foreseeable from these predicate facts, *Marla H.*, 361 S.W.3d at 532, the Court finds that it was reasonably foreseeable that diagonal braces installed with their sharp edges exposed and facing upward—with or without the presence of a tripping hazard in the area—could potentially be the source of grave harm to an individual performing work in the immediate area of the braces,[4] and that this risk of harm outweighs any burden associated with mitigating the injury risk from the temporary braces' sharp edges by installing them differently or covering them in some way, or by otherwise warning of or controlling for their sharpness. Accordingly, although there are no genuine disputes of material fact with respect to the first element of Plaintiff's negligence claim—a duty of care owed him by New Century—Defendant has not met its burden, as the summary judgment

---

[4] As the Tennessee Supreme Court has noted, while accidents "almost invariably are surprises, in the sense that the precise manner of their occurrence cannot be foreseen," "the particular harm need not have been foreseeable if another 'harm of a like general character was reasonably foreseeable.'" *Moon v. St. Thomas Hosp.*, 983 S.W.2d 225, 229 (Tenn. 1998) (quoting *Spivey v. St. Thomas Hospital*, 211 S.W.2d 450, 455 (Tenn. Ct. App. 1947)).

movant, to establish that it prevails as a matter of law on that element (by negating it). Thus, to prevail on its Motion, it will need to succeed with respect to a different element of Plaintiff's negligence claim.[5]

## Breach and Causation

As support for its argument that breach and causation-in-fact are negated (as a matter of law) by a showing of Plaintiff's negligence in tripping over the wire mesh, New Century relies on an unpublished 2008 decision of the Tennessee Court of Appeals, *Sugg v. Mapco Express, Inc.*, No. M2007-01503-COA-R3-CV, 2008 WL 2695666, at *5 (Tenn. Ct. App. July 9, 2008). *Sugg* involved husband-and-wife plaintiffs who sued for negligence after the wife (Mrs. Sugg) was injured as a result of a fall from a sidewalk curb while exiting a Mapco convenience store. In their complaint, the plaintiffs blamed Mrs. Sugg's fall on insufficient lighting and Mapco's failure to distinctly mark the curb, only to later concede at deposition that there was "plenty of light" and "that [Mrs. Sugg's] failure to look down," rather than a lack of proper curb-marking, caused her fall. *Id.* at *5. The *Sugg* court therefore found that summary judgment was properly entered in Mapco's favor, as it "affirmatively negated the essential elements of breach and cause in fact," rendering any consideration of Mrs. Sugg's comparative fault "unnecessary, as the Suggs could not establish the essential elements of their claim." *Id.* at *5–6.

*Sugg* is readily distinguishable on its facts from the case at bar. Here, even if it were undisputed that Plaintiff "saw the wire mesh,"[6] it would not necessarily follow that there is no

---

[5] To the extent that the Court should make an actual determination at the current (summary-judgment) stage because the existence of a duty of care is a question of law for the court under Tennessee law, the Court would make that actual determination against Defendant by finding that it owed Plaintiff a duty of care.

[6] Plaintiff contends that there is a factual dispute as to whether he saw the wire mesh "at the time he tripped over it," citing his own, rather imprecise deposition testimony. (Doc. No. 103 at 15.)

genuine issue of material fact concerning the cause of Plaintiff's fall, much less the cause of his laceration injury. Instead of negating the essential elements of breach and causation[7] by showing that Plaintiff, having seen the mesh, "could have moved" it or taken "easily usable alternate routes" around it (Doc. No. 86-1 at 6), New Century has merely identified evidence in support of its affirmative defense of Plaintiff's comparative fault, which it pled in its Answer to the Amended Complaint. (Doc. No. 56 at 6.) "In a negligence case, '[i]f the defendant has plead[ed] the affirmative defense of the plaintiff's relative fault, the reasonableness of the plaintiff's conduct in confronting a risk should be determined under the principles of comparative fault.'" *Hatfield v. Circle K Stores, Inc.*, No. 1:17-CV-82-SKL, 2018 WL 11463581, at *5 (E.D. Tenn. Mar. 13, 2018) (quoting *Staples v. CBL & Assocs., Inc.*, 15 S.W.3d 83, 91 (Tenn. 2000)). As discussed below, while this evidence proffered by New Century may prove significant in the eyes of the jury, it is not so overwhelming on this summary judgment record as to negate Plaintiff's ability to proceed to trial of these issues.

## Comparative Fault

Tennessee has adopted a system of "modified" comparative fault. *McIntyre v. Balentine*, 833 S.W.2d 52, 57 (Tenn. 1992). Under this system, "so long as a plaintiff's negligence remains less than the defendant's negligence"—that is, so long as the plaintiff is 49 percent negligent or less—the plaintiff may recover, with that recovery "reduced in proportion to the percentage of the total negligence attributable to the plaintiff." *Id.* (adopting the "49 percent rule"). In the vast majority of cases, "the comparison and allocation of fault is a question of fact to be decided by the finder of fact, that is the jury or the trial court sitting without a jury." *Hatfield*, 2018 WL 11463581,

---

[7] The Court notes that New Century, citing *Sugg*, argues only that Plaintiff's choice to confront the risk of the wire mesh in his path negated the element of causation in fact; it does not argue that the element of proximate causation was also negated.

at *5 (quoting *Henley v. Amacher*, No. M1999-02799-COA-R3-CV, 2002 WL 100402, at *6 (Tenn. Ct. App. Jan. 28, 2002)).

Here, New Century argues that "reasonable minds cannot differ" as to whether Plaintiff is 50% or more at fault in this case, and that summary judgment is therefore proper. (Doc. No. 86-1 at 7–8.) But this argument is unavailing. New Century compares the facts here to the case in *Berry v. Houchens Market of Tennessee, Inc.*, 253 S.W.3d 141 (Tenn. Ct. App. 2007), where summary judgment was entered against the plaintiff because, as a matter of law, she was at least 50% at fault for slipping and falling in a large puddle of oil that was "in plain sight" and "clearly distinguishable" from the surrounding pavement, due to her "absolute lack of attention" and admission that she failed to see the oil because "she never looks down when she is walking." *Id.* at 148. The facts of *Berry* are simply not comparable to the facts on this summary judgment record, which are to be construed in Plaintiff's favor along with any inferences that might be drawn from them, and which require adherence to, rather than departure from, the general rule that "comparative fault is a question of fact within the jury's province, which should not lightly be invaded by the trial court." *Wall v. Wal-mart Stores E., L.P.*, 446 F. Supp. 3d 254, 257 (M.D. Tenn. 2020) (quoting *LaRue v. 1817 Lake Inc.*, 966 S.W.2d 423, 427 (Tenn. Ct. App. 1997)).

Plaintiff's decision to take a path through the storage unit frames to reach his co-worker Reggie may well haunt him, and even prevent the jury from returning a verdict in his favor, at trial. But "[t]he reasonableness of a plaintiff's decision to encounter [a known] risk is a factual determination" for the jury, and even "ample evidence" that the plaintiff's decision "was ill-advised and negligent" will not justify summary judgment on the issue. *LaRue*, 966 S.W.2d at 426–27 (quoting *Silcox v. Coffee*, No. 01A01-9304-CV-00166, 1993 WL 350134, at *5 (Tenn. Ct. App. Sept. 15, 1993)). Because the Court "cannot say that a rational trier of fact could not find that

the percentage of fault attributable to Plaintiff was less than 50%[,] . . . there are genuine disputed issues of material fact with regard to comparative fault in this case, making summary judgment inappropriate." *Reynolds v. Rich*, 511 S.W.3d 526, 536 (Tenn. Ct. App. 2016).

## CONCLUSION

For these reasons, New Century's Motion for Summary Judgment (Doc. No. 86) is **DENIED**.

IT IS SO ORDERED.

*Eli Richardson*

ELI RICHARDSON
UNITED STATES DISTRICT JUDGE